Ellison v. St. Joseph's, Candler Health System, Inc. Mr. Wolfe, come right up and welcome this morning. Thank you. It's good to be here. Thank you for providing oral argument in this case. My name is Wesley Wolfe. I represent Naomi Ellison, plaintiff in the court below. She is an African American individual who was employed by one of the local hospitals, St. Joseph's Candler. And it's one of the larger employers in the county. It pays well, good benefits. So it is an attractive place for people to be employed. She received excellent recommendations in support of her application for a position with the hospital. She's worked in a position like this for 30 years and never had the sort of problems that she's confronted and we're going to talk about today. She worked for St. Joseph's only 16 months, I believe. Ms. Ellison works at the bottom rung of the hospital employment hierarchy. She is a patient care technician, was. She still performs this work. But she would clean up patients coming out of ICU who had soiled themselves. She bathed them and that sort of thing. When asked during her deposition, changing diapers has to be pretty bad. Yeah, but that's part of the job, she replied. What about helping the patient void? Is that a fun part of the job? It's okay, says Ms. Ellison. It's something I have to do. Cleaning soiled patients, that didn't bother you? No, not at all. What's the best part of the job? Making sure that they're clean and presentable for the family. Ms. Ellison makes $12 an hour and she raises the flag when the family comes in and her patient is clean and presentable. She's a hard worker. She asks for more work. She never took, she never left early from a shift. She always asked for overtime. Never left early for a shift until this evening of October the 11th. So for months she had complained about racial prejudice from the individual Ms. Gillingham, a nurse. And when Ms. Gillingham came to her and they interacted on the night of October 11th and she called, Ms. Gillingham called her the N-word, Ms. Ellison was absolutely devastated. She complained immediately of the chain of command, first to her charge nurse, then the house supervisor who is, acknowledges her role as the fixer at the hospital. She asked to go home and was allowed to do so. And on her drive home, the house supervisor calls her on the cell phone and excludes her from the workplace until further notice. She made, she complained in her complaints, to be clear, she made specific complaint to the charge nurse, specific complaint to the house supervisor that the N-word was used and she was called this racial slur. Sixteen days later, well in two days later she goes to her supervisor, the decision maker, one more level up the chain of command, Mr. Winkler, complains again specifically informing him of the use of the N-word and the nature of the complaint. And 16 days later her employment was terminated. She had no documented performance issues and indeed what was documented was favorable and it was favorable specifically for at least one of the targeted reasons for which she was terminated, patient complaints. This is a retaliation case under the opposition clause of Title VII. The evidence in the case obliges itself to the construct of a prima facie case under McDonnell Douglas. And that case, the prima facie case has been met, the district court concluded. Ms. Ellison complained about discrimination in the workplace. She was excluded from the workplace. Ms. Ellison works by the hour. If she doesn't work, she doesn't get paid. She's excluded from the workplace within the hour. She's terminated 18 days later. So she suffered those adverse actions and then there's the causative link between that complaint and the adverse action. Now there's a wrinkle in this case, of course, with the first element of the prima facie case, which is that the complaint has to be about an unlawful employment practice. And we briefed that thoroughly. I believe the defendants have not cross appealed the district court's conclusion on that issue, but we've briefed it. And as I think the court knows under Little v. United Technologies and its progeny, the complaint does have to be about an unlawful employment practice. It can't just be a mere co-worker calling somebody a bad name in the workplace. And Little v. United Technologies, it says, of course quoted, a racial derogatory remark by a co-worker without more does not constitute an unlawful employment practice. Well, there is more in this case. And the district court pointed to two of the mores related, one of which is the complaints by Ms. Ellison for a number of months to her supervisor, the charge nurse, about the racial prejudice of Ms. Gillingham, the co-worker. The other item identified by the district court was the virtually identical incident of one year earlier. Another patient care technician, another African-American, called the same name by the same co-worker, the co-worker nurse. And it was known to every level of supervision, charge nurse, house supervisor, director of the department. But there's even more. I wanted to make sure that we got on the record and you understand. And there's even more that the district court could have pointed to in terms of developing this unlawful employment practice fact. And Wilson v. Farley, this court emphasized the importance of an opportunity to exercise influence or authority by the co-worker delivering the racial or the other invective. And Ms. Gillingham, the co-worker who uttered the remark, does have supervisory responsibilities over Ellison. They're not extensive, but if Ms. Gillingham tells Ms. Ellison what to do, she is required to do it. And that's in the record. Ms. Ellison and Littler and Butler v. Alabama Department of Transportation, the complaints were eight months and three months later, respectively. Now, Ms. Ellison went immediately, same night. She heard this comment from the co-worker. She went immediately to her supervisor. So it's unlike Little and Butler in that respect. Let me try to help you focus on this concern. They gave two legitimate reasons, they said, for terminating her. Is that correct? Yes, ma'am. And one was the noncompliance with the co-worker compact. And the other was patient complaint. That's correct. And those were documented in the record. So your job is to show those were pretextual. I'm just trying to make sure I understand where the real issue is here. Okay. If that's the court's concern, I want to address it. But is that not the issue we need to deal with here, whether there's pretext? They did articulate two reasons, correct? That's correct. Yes, ma'am. Okay. And there were some patient complaints. Yes, there were some patient complaints. Okay. And they claim, yeah, right. Well, they had them there. It's not a matter of they didn't exist. They might not have been that serious. Well, they're alleged by the defendant. I don't think the plaintiff doesn't agree that there were patient complaints. She wouldn't know them. They never brought them up to her. Right. But the essential point here is that they've said enough to establish a nondiscriminatory reason. So we get to the question of pretext. That's the essential question, right? Okay. Do you agree? Do you agree that that's the essential? I would be glad that that would be the essential issue in this case, if that's the case. Because that's what you're appealing from. Well, it is what I'm appealing from, yes, because the district court agreed to those. But the issue has been raised by the defendant, by the appellee in this case, and I wanted to make sure we had that nailed down. The issue of pretext, the patient complaints were determined by the court to not be credible. The defendants in this case have raised the issue of honest belief. Patient complaints were allegedly made. The defendant allegedly honestly believed them, the defendant's supervisor, decision maker. But in the meeting to terminate Ms. Ellison, the decision maker offers Ms. Ellison a card with some business contacts and says, here, go find a job treating other patients. The patient complaints border, alleged patient complaints border on patient abuse. And here the decision maker has referred Ms. Ellison to another company that serves patients. And they're not only just patients in a hospital that have some supervisory oversight, they're patients that actually are at home alone and vulnerable to an individual that might want to abuse them. The district court saw right through that. There's no honest belief there by Mr. Winkler that these patient complaints actually existed. That would admittedly eliminate the problem that she allegedly had getting along with her coworkers and her non-adherence to the whatever that was, I'd never heard of anything like it, a code, kind of an employee's code of conduct. It's the catch-all for whatever reason they would like to point to, to have somebody terminated. It's got every possible violation of workplace conduct. But one argument I want to get forward is that the patient complaint justification for termination has been, had the rug pulled out from it. The hospital puts into place and asserts the honest belief defense. The district court says properly he could not have honest, or a jury at least, could reasonably believe that he did not honestly believe that. A jury could also honestly believe that Mr. Winkler was being dishonest in asserting his honest belief. His credibility through evidence has been obliterated, in my opinion. And then we come to the second defense, or the second reason for termination, the coworker complaints, inability to get along with others. Well, it's the same individual asserting these coworker complaints, inability to get along with others. His credibility has been destroyed with respect to the first reason for termination. A jury would reasonably be able to disbelieve any further explanation he gave for terminating Ms. Ellison's employment. Thank you, counsel. You have reserved five minutes for rebuttal. Thank you. Good morning, Your Honors. Jason DeCruz on behalf of St. Joseph's Candler Health Systems, Inc. Counsel in their briefs state that this case is not about the altercation that happened on October the 11th. We'd like to start with what this case is about. It is about that altercation and the information that the decision makers learned upon investigating that particular incident. It is about a delay in cleaning a patient who had a bowel movement in her bed, the most humiliating thing that you can do, and the argument that ensued between the nurse who cleaned this up and Ms. Ellison as a result of that delay. Through the investigation, the decision maker, the undisputed decision maker, Mr. Winkler. Well, you know, it's odd indeed on this record. If that indeed amounted to the rationale for the termination, how do we explain that at the time that Winkler notified Ellison that she's being terminated, he gives her his business card, referring her to another health care company that also worked closely with patients, and when asked about her ability to perform this job, which would require her to work alone with patients, he testified that she was good with individuals, just that she wasn't good as a team member. It tends to undermine the theory that he was shocked about her egregious relationship with patients, that he would say, she's a good worker, here's my card, go use it, and I'll help you get another job. It does tend to undermine that explanation, does it not? Judge Marcus, we actually disagree with the district judge on that point. In fact, we think it doesn't show retaliatory intent. We think it shows human nature. We've all fired people. Was the recitation of the facts as I laid them out accurate? No. The actual testimony that it says is he gave her a card to go be a sitter. So he was asked, what does the sitter do, as you understand it, at the time you referred her? That would be a person that needed someone to stay at home with somebody during the daytime, strictly one-on-one. And would they do the things like clean up the person they're sitting for? Answer, cook, housekeeper, pretty much totally. Why did he give her the card in the first place? Because he's a nice person. If you fire a law clerk or an associate, you're going to say you might do better in-house. You might do better at an agency. You might do better at a smaller firm or a larger firm. That's human nature. So what Judge Moore's decision does is puts a chilling effect on supervisors and HR departments who already are going to say name, rank, and serial number when you give references because you don't want to get sued. But just because she didn't work well, and he goes on to say, Your Honor, cook, housekeeper, pretty much total care with emphasis on personal care, comma, not medical care. That's in the record 32-7 at 78 and 79. I take it Winkler himself signed off on a satisfactory evaluation of Ellison. Regarding customer service less than two months before the termination, is that accurate? He did not. I believe it was a different supervisor. I thought it was Winkler who signed off. Maybe Winkler did, yes. That's my recollection of docket entry 32-9 at page 87. Have I misunderstood that? No, that's correct. But what Winkler also testifies to is it wasn't past performance that he was concerned about. It was her present performance. There was an altercation, Judge. She was yelling liar, liar down the hallway. She told and she admitted and she put in this statement, this kind of amorphous statement. She put in the statement, I told her I was not going to do any more work for her that night. That goes to the coworker compact. Those are undisputed facts. Let me ask you this. When Winkler was asked in his deposition what the violations of the coworker compact were, he simply said they were discussed in Eldritch's deposition. He didn't offer any himself, right? He said she identified every particular area. But did he offer an explanation himself? Beyond saying go look at that deposition, you'll get your answer. He did say that, Your Honor. He also, if you put it into context, he also said I've been gone for three years. I'm no longer a supervisor. I don't remember this. I did have a detailed discussion with Eldritch before the meeting, and she went through these coworker compact violations, which I agreed with. And I did look at Eldritch's deposition, and I agree with those reasons, and I don't want to repeat those now because I may not say exactly the same thing that she said. And there was no follow-up from counsel on, okay, well, Eldritch said this. Why do you think that was a violation of the coworker compact? So I think if you put it into context, you know, and look, Ms. Ellison's memory was awful if you've read her deposition. This is a guy who's been out of the system for three years, doesn't remember this case, was not going to remember all of the violations of the coworker compact. Let me ask you a slightly different thing. We also have in evidence here the incident regarding Jeanette McKinnon. What are we to make of that? That's the one where allegedly a strikingly similar incident with Gillingham is recounted in McKinnon's declaration. The incident occurred about a year before the altercation involving Ellison. McKinnon says that Gillingham used the same racial epithet with her, and McKinnon was terminated shortly thereafter. What do we make about that? Wasn't Winkler the guy who signed off on McKinnon's termination papers? And if you actually look at that termination . . . Do I have that right is all I'm asking you? You have it correct that Winkler signed the change request form. That is an administrative form, and the only thing on that administrative form that mentioned anything about it was that she was terminated for violence in the workplace. It does not . . . So he would not have seen the discussion of what she alleged and so on and so forth? That's correct, and he testified, and it's undisputed . . . No, I know what he said, because he said he didn't know anything about McKinnon. Right. The incident was never reported to him while he was a director of critical care. She had different supervisors, but I'm just asking about the actual . . . What it means to say that Winkler signed off on McKinnon's termination papers? It's an administrative form, so somebody within your chambers leaves and is fired. You have nothing to do with that firing. The court sends you a piece of paper that says, okay, this person is now gone. We're now going to hire somebody else. It's an administrative paperwork from the HR department. Simply codifies something that had already been done by someone else? That is correct. That's what the change request form is. It has nothing to do with him making the decision. In fact, he was not the decision maker. In addition, they point to the emails, which he was copied on, with respect to . . . Are you saying he's not the decision maker as to McKinnon? Yes. Who was identified in the record as the decision maker if he wasn't? It was, I think, Alicia Motley or the nurse manager at that time, but it was not Winkler. The other . . . It was Motley. I believe it was either Motley or there were two other people, but it was not Winkler and it was not Heldreth. The two people involved in the Ellison termination. It's not Winkler or not. Who was the second one? Heldreth. Heather Heldreth. Heldreth, okay. Let me ask you this. I know she complained about the racial epithet. Did everybody deny they heard that, or was there somebody corroborated it, or what is the status of the record? It's enough to create an issue of fact that it was made by virtue of her testimony, but I'm just curious. For purposes of summary judgment, we admitted that she complained about the racial epithet. Right. But nobody corroborated it. Gillingham denied it, and there were no witnesses that corroborated hearing the N-word. And did they at all investigate that and come to a conclusion as to Gillingham, or what did they do about her complaint other than fire her 16 days later? Well, they sat down with her, Judge Hall, and they tried to go through the incident, and she refused. She denied everything, and she said she didn't do anything wrong. Okay. So they did give her the opportunity. Help me with this. I thought, just to follow up on Judge Hall's question, I thought that they assigned Heldreth the task of obtaining statements and looking into this, right? Correct, Your Honor. Heldreth, however, never obtained any statement, did you, from all of the people who worked that night? Including Henrietta Kasson, who was the unit secretary who originally called Ellison to tell her a patient needed to be cleaned? Is that accurate? No. Heldreth testified that she talked to everyone on that shift. Including Kasson. That's what she testified to. And she said that they got the statements that they got. To answer your question, it was But does she give an opinion or a report of her investigation about what happened in writing, or is it just verbal, or there's no report at all back after she's asked to investigate? There is no report. She gives the statements. She goes through the statements and her investigation with Mr. Winkler, who made the decision to sit down and talk to Ms. Ellison and confront her with these allegations. And when Ms. Ellison denied them all, he found that not to be credible and moved to the termination decision. Judge Marcus, to answer your question, it was Alicia Motley who Who terminated McKinnon. Janine McKinnon, yes. Thank you. Let me ask you this question about the conduct of the investigation itself, because that's a point that he references and highlights as suggesting that the reasons offered were pretextual. The investigation was not turned over to the Human Resources Department, was it? It was not, correct, Your Honor. And it would be the defendant's policy to hand it over to Human Resources if, indeed, she had been placed on administrative leave, right? Correct, but she was not. So the only issue was whether or not she was actually placed on administrative leave. Right. And the record is actually pretty clear on that. Help me with that because I thought there was a dispute about whether being told not to come back to work until she had spoken with her manager constituted administrative leave. Okay. Leslie Jones-Bennett, the house supervisor. So on the night shift, the managers aren't there. They have a house supervisor. The house supervisor is in charge of the house, as it sounds. So if there's a confrontation and somebody wants to leave, the house supervisor says, leave. She found out. She said, I had a headache. Right? She didn't say the N word. She said, I had a headache. She let her go because the charge nurse said, she's not going to do any work anyway. Might as well let her go. She then finds out that it was this altercation where she didn't tend to the soiled patient and then yelled, liar, liar, and all those kind of things. So the house supervisor calls her back and says, look, don't come back to work until you talk to your nurse manager. Right? There's an altercation. They need to look at what went on. Ellison testifies. She talked to the managers the next day. She was not scheduled to work the next day, and she testified that she did not miss one shift. In fact, we know she didn't miss any shift because on October the 25th, she had more patient complaints against her, the intervening events. So she was never placed on administrative leave. There's no HR file about that. There's nothing because Winkler put her back to work pending the investigation. She did not lose one penny.  Help me just with this factually. As I understand the account here, after, according to Ellison, Gillingham made the racial epithets to her, Ellison claimed that she immediately went to charge nurse Rebecca Floyd and told her what Gillingham had said. Does Rebecca Floyd testify, and does she deny that that was ever said to her? She does. And then Ellison said she called the unit supervisor, Leslie Jones Bennett, and also purportedly told her what Gillingham had said and asked to go home because her head hurt. Bennett also told her to go home. Does she, Leslie Jones Bennett, confirm that Ellison had told her that? She does not. She says it didn't happen that way. Correct, Your Honor. Then the next day, Ellison said she attempted to call her supervisor, Heldreth, and Winkler several times and left messages. Winkler said he called her back. She went to meet him, and she told him what Gillingham had said to her. That's accurate, I take it. It's accurate that she talked to Winkler. And related to Winkler that. That Gillingham mumbled a racial slur. Whereas the other two say she never even told them that the night before. Do I have that right? Correct. Okay. I'm curious again. Does the record reflect that the conduct that is the subject of patient complaints, I'm not talking about when the complaint was made, but the conduct itself was subsequent to October 11? Or were these patient complaints and employee complaints, do those predate October 11? There is a report on October the 25th, post-October the 11th, of additional patient complaints. But you don't know. On that shift. Okay. In other words, the complaints are about conduct that took place then. Correct. That actually took place on the October 25th shift. I thought there was also some summary of allegations of patient complaints that predated the incident on the 11th. There were. That all of a sudden surfaced after. No, there were. Those complaints, Your Honor, came in the statements from Floyd, Jones-Bennett, and Jada McNeely. And then when Ellison worked on the 25th, Your Honor, there were complaints on that shift from those patients on the 25th, which were reported. Thanks very much. Okay. But to be clear, so when they're investigating the incident, that's when Floyd and Jones-Bennett talk about the complaints. Correct. And I think Judge Moore said it correctly. When you do investigate a situation like that, you're going to find out about some of these things. That's not unusual to find that out. And this Court has seen that before. Right. But the point is those incidents were not triggered before that. They weren't presented before that. They may have occurred before that, but they were not, they didn't surface, percolate, or come to the attention of the boss. Is that right? That is correct. And that's also kind of co-worker nature. Right? You're not going to. I understand. You're not going to start raising things unless there's an incident. Thank you. Thank you, Your Honor. The October 25th report was a post-incident report of patient complaints. In an earlier email on October the 16th, Ms. Floyd said the patient complaints were happening all the time. Nothing was done about those patient complaints, of course, until Ms. Ellison complained about racial discrimination. Does your client deny that somebody complained on October 25th? I don't know if it's accurate or not. She does. Okay. What was the complaint allegedly about from a patient and who reported it? Ms. Floyd reported it during the investigation. Floyd reported it? And what did, no, I'm talking about the October 25th one. And those were the additional complaints reported by Ms. Floyd during the investigation. In an October 16 email prior to that, Ms. Floyd reports that patient complaints had occurred all the time. Ms. Floyd also reported that Ms. McKinnon had committed violent criminal conduct prior to her termination. It was like, you know, the investigation comes into Ms. McKinnon's conduct and Ms. McKinnon's complaints and all of a sudden it starts, you know, the prior instances, everybody starts feeding in on what Ms. McKinnon's been doing wrong for the past six months or a year. So it's an identical setup, the same, or identical circumstance, identical. The difference he references is that Winkler didn't terminate McKinnon. Is that accurate or inaccurate? It is not accurate. Winkler signs the form on Ms. Ellison's termination form, the same way he signed it on Ms. McKinnon. He is the director of department on that form and his name, his signature is in the same place on Ms. McKinnon's termination form as it is on Ms. Ellison's termination form. Did he sign anything else with respect to Ellison beyond this termination report saying I terminated you? I think he, the, Anything else or is that all she wrote in the record? For Ellison? Yeah. He signed the disciplinary action report that I believe renders a conclusion of termination. And did he sign the same for McKinnon? Ms. McKinnon did not get a disciplinary action report. Her conduct, Ms. McKinnon's conduct seems to have been actual violence or threatening of violence in the workplace. It is not identical situation in that respect. We are just trying to figure out who decided to terminate her, not who just signs the administrative form of termination. We will look at the form. Do you know what the record site is for the form? For Ms. Ellison or Ms. McKinnon? Either one. Ms. McKinnon, both of them are officially terminated by a form signed by the Director of Development and the Director of Development slot by Mr. Winkler. Okay. He's playing the same role. Do you know where the form is in the record? If not, we can sign. Yes, I do. Yes, I do. It is the document 32-30-10. Winkler disclaims any knowledge of Ms. McKinnon, period. Was he the decision maker? What's that? Was he the decision maker is the question. In both things. I'm not asking about Ellison. That's clear. Yes. I'm talking about was he the decision maker who said McKinnon is fired. I'm the guy who has to decide it. I'm deciding it. I don't think there's anything in the record that clearly says that, Your Honor. Because he says that there was another individual. Well, there's another. Bear with me. Excuse me. Who was the terminating decision maker and that all Winkler did was sign a paper as an administrator later. That's his account. The other decision maker is Ms. Motley. She has the same role as Ms. Heldreth with respect to Ms. Ellison. So Ms. Heldreth takes over for Ms. Motley. Motley would have to perform the same role with Ms. McKinnon that Ms. Heldreth performed with Ms. Ellison. Ms. Heldreth made a recommendation to Winkler, who signed off on the termination paper, to terminate. He is the decision maker. I think we're entitled to that inference. If it's not crystal clear in the record, we're at least entitled to that inference that he's the decision maker in both cases because of that. I think the district court was with you on that, as I understood the opinion. But I would like to know whether the record reflects that Mr. Winkler knew about Ms. McKinnon's complaints about Ms. Gillingham. Yes. Document 32-30, page 5, page 10, page 18. It's not just pro forma signing a form by Mr. Winkler to have Ms. McKinnon terminated. He is informed of the controversy on 7th Floor South, the night that caused Ms. McKinnon's termination. How do we know that? Are we going to find that at 32-30? 32-30, page 5, page 10, page 18. They're long emails that Mr. Winkler is copying. They have specifically the allegation that McKinnon made that Gillingham had made racial efforts to her. No. Race is nowhere in these documents, Your Honor. It is cleansed from the discussion at St. Joseph's Candler. You don't say race in that hospital. And there is a suggestion here and an inference of mendacity on the part of Mr. Winkler and others that justifies a jury trial on this issue. If you would look at his explanations of whether he heard a racial slur or not, he's all over the place on whether he may have heard something that sounded like a racial slur, maybe it was a racial slur. Yes, it was a racial slur. With respect to Ellison or McKinnon? Ellison, excuse me. Well, also, we could look at the record and say that there's some question as to whether Ms. Ellison is telling the truth with respect to when she reported the slur. It's denied, as I understand the record. Yes, Your Honor. So, you know, talking about mendacity, we always have questions of fact. Well, you don't have the clear difference in the record. But you just want a trial is what you're asking for. Well, that's what would happen if we go back to the district court. There was one issue of whether there was a corroboration of the epithet, which goes to your question here. Ms. Jada Healy, who's a young nurse who was deposed early on, came back, this was a buzz all over the floor. Everybody was talking about it on 7 South, the racial controversy and the conflict between the two of them. So she didn't quite know how to manage the situation, this young girl. And she testified that, in fact, there was that discussion. There was that conflict. So, yes, everybody may or may not be, I mean, there's, you know, depending on what side of the case you're on, of course, Ms. Ellison's not telling the truth or the defendant's not telling the truth. But Ms. Ellison is entitled to inferences. She's entitled to her version of the facts on this motion for summary judgment. And the evidence is conflicting. And we want a jury trial and urge you to reverse the district court order and remand for that. Thank you very much. Thank you both. And we'll go on to the last of the cases.